*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0312p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NATIONAL LABOR RELATIONS BOARD,
          *Petitioner/Cross-Respondent*,

UNITED ASSOCIATION OF JOURNEYMEN AND
APPRENTICES OF THE PLUMBING AND PIPE
FITTING INDUSTRY OF THE UNITED STATES
AND CANADA, AFL-CIO; LOCAL 357, UNITED
ASSOCIATION OF JOURNEYMEN AND
APPRENTICES OF THE PLUMBING AND PIPE
FITTING INDUSTRY; LOCAL 7 OF THE SHEET
METAL WORKERS INTERNATIONAL
ASSOCIATION,
                    *Intervenors*,

          *v.*

ALLIED MECHANICAL SERVICES, INC.,
          *Respondent/Cross-Petitioner*.

No. 12-1235/1351

On Application for Enforcement and Cross-Petition for a Review of an Order of the
National Labor Relations Board..
Nos. 7-CA-41687; 7-CA-41783; 7-CA-41993.

Argued: March 15, 2013

Decided and Filed: October 30, 2013

Before: DAUGHTREY, ROGERS, and McKEAGUE, Circuit Judges

_____

## COUNSEL

**ARGUED:** Kira Dellinger Vol, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner/Cross-Respondent. David M. Buday, MILLER JOHNSON, Kalamazoo, Michigan, for Respondent/Cross-Petitioner. Nicholas R. Femia, O'DONOGHUE & O'DONOGHUE LLP, Washington, D.C., for Intervenor United Association of Journeymen. Tinamarie Pappas, LAW OFFICES OF TINAMARIE PAPPAS, Ann Arbor, Michigan, for Intervenor UA Plumbers. **ON BRIEF:** Kira Dellinger Vol, Julie Broido, Linda Dreeben, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner/Cross-Respondent. David M. Buday, Gregory P. Ripple, MILLER JOHNSON, Kalamazoo, Michigan, for

Respondent/Cross-Petitioner. Nicholas R. Femia, O'DONOGHUE & O'DONOGHUE LLP, Washington, D.C., for Intervenor United Association of Journeymen. Tinamarie Pappas, LAW OFFICES OF TINAMARIE PAPPAS, Ann Arbor, Michigan, for Intervenor UA Plumbers.

ROGERS, J., delivered the opinion of the court, in which McKEAGUE, J. joined. DAUGHTREY, J. (pp. 14-25), delivered a separate dissenting opinion.

_____

# OPINION

_____

ROGERS, Circuit Judge.  Allied Mechanical Services, a union contractor, filed suit against employee unions and their affiliates claiming that the unions improperly interfered with benefits promised to Allied in an agreement with one of the unions. Allied alleged breach of the collective bargaining agreement and violations under the section of the National Labor Relations Act (NLRA) used to punish so-called secondary boycotts.  The district court dismissed Allied's suit for failure to state any claim upon which relief could be granted, and the National Labor Relations Board (NLRB) later determined that the bringing of the federal suit constituted an unfair labor practice. Applying the substantial evidence test in a way that takes into account this court's expertise in both the First Amendment and federal litigation, that test is not met. Important First Amendment considerations keep us from upholding the Board's order in this case.

This suit appears before this court following two related administrative decisions, which concluded that Allied violated § 8(a)(1) of the National Labor Relations Act by bringing a federal suit against a number of local and national labor union entities.  An Administrative Law Judge (ALJ), and later the full National Labor Relations Board, concluded that the suit was an unfair labor practice in that it "interfere[d] with, restrain[ed], or coerce[d] employees in the exercise of" their rights to organize and engage in collective bargaining and related activities.  *See Allied Mech. Servs., Inc.*, 357 NLRB No. 101, 2011 WL 5374170 (Oct. 25, 2011); 29 U.S.C. §§ 157–58.

Allied Mechanical Services, a Michigan manufacturer and installer of heating, ventilation, and air-conditioning systems, brought the underlying federal lawsuit against several defendants. These included:

- Local 357 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry—the local chapter of plumbers and pipe-fitters, with which Allied had in the past had a tumultuous relationship;

- Local 7 of the Sheet Metal Workers' International Association—the local chapter of sheet metal workers, with which Allied had not had prior problems; and

- the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO—Local 357's umbrella organization, with which Allied had not historically dealt directly.

Allied argued that the two local unions colluded to withhold otherwise available job-targeting funds from Allied. The job-targeting-fund program provided union contractors with money that would enable the employers to lower bids on certain jobs so that union contractors could achieve a competitive advantage over non-union contractors. Under the program, Local 7 collected dues from its members, including Allied employees, and used those dues in part to subsidize union contractors who chose to be part of the program.

In February of 1998, Local 7 made job-targeting funds available for a job for the Kalamazoo Red Cross. However, although Allied had previously received job-targeting funds from Local 7, the union did not allow Allied to receive funds for the Red Cross job. Allied claimed that following the Red Cross job, Local 7 denied it job-targeting funds for several other projects, while other union contractors continued to benefit from the program. According to Allied, Local 7's business agent informed Allied that it would not be eligible for funds on the Red Cross job because Allied had not signed a collective-bargaining agreement with the plumbers and pipe-fitters union (Local 357[1]).

---

[1] Prior to 1998, the plumbers and pipe-fitters were represented by two organizations, Local 337 and Local 357, which merged in March of that year. For purposes of this opinion, we refer to the entities as "Local 357."

Allied's history with Local 357 was characterized by labor disputes,[2] and the two had consistently failed to reach a collective-bargaining agreement despite years of negotiations. Based on the information from Local 7's business manager and on the company's history with Local 357, Allied concluded that the two local unions and their national counterparts were responsible for illegally keeping Allied from getting the job-targeting funds.

Allied's complaint, which it filed in the federal district court for the Western District of Michigan, named the two local unions and the national unions. Count 1 alleged that the plumbers and pipe-fitters violated § 8(b)(4) of the NLRA by causing Local 7 to deny job-targeting funds for the jobs. Count 2 alleged that the same provision of the NLRA was violated because the plumbers and pipe-fitters denied Allied the use of the funds and thereby created a "barrier" that "restrain[ed]" it from doing business with potential customers. Count 3 alleged that the local and national sheet metal unions violated § 301 of the NLRA by breaching Local 7's collective-bargaining agreement with Allied. Finally, Count 4 alleged that the plumbers and pipe-fitters (local and national) "threatened, coerced, or otherwise restrained" Allied's plumbing and pipe-fitting employees by preventing Local 7 from awarding Allied job-targeting funds, also in violation of § 8(b)(4) of the NLRA.

In a lengthy opinion, the district court dismissed Allied's complaint in its entirety. A panel of this court affirmed in a per curiam opinion. *Allied Mech. Servs., Inc. v. Local 337*, 221 F.3d 1333, 2000 WL 924594 (6th Cir. 2000). Three of Allied's claims—the ones pertaining to § 8(b)(4)—alleged, in essence, that the unions violated the so-called "secondary boycott" provisions of the Act, which prohibit any act "whose sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it." *Local 761, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 366 U.S. 667, 672 (1961) (internal quotation marks removed). On de novo review, this court agreed with the district court that any influence exerted by the

---

[2]On four occasions between 1993 and 1998, the NLRB found that Allied had violated the NLRA. *See Allied Mech. Servs., Inc.*, 357 NLRB No. 101, 2011 WL 5374170, at *1–2.

plumbers and pipe-fitters over Local 7's use of its job-targeting funds was not sufficient to trigger the protections of the secondary-boycott provisions of the NLRA. *Allied Mech. Servs., Inc.*, 2000 WL 924594, at *4–5. Finally, this court affirmed the district court's conclusion that Allied's breach-of-contract claim was not subject to review because an arbitrator had already reached a final and binding decision on the matter within his decision-making authority, under the terms of the CBA. On this claim, our court noted that "[w]ere we free to interpret the contract, or review the claims of factual or legal error, . . . we would be inclined to view this claim differently than the [arbitral board]." *Id.* at *7.

After the litigation concluded, the unions brought an unfair-labor-practice claim before the NLRB, claiming that Allied violated the NLRA by filing the federal suit. On February 21, 2001, an ALJ agreed with the unions and decided that the unions must be reimbursed for their expenses in litigating the federal suit, but denied "the extraordinary remedy of reimbursement to the government and the Charging Parties for their costs in litigating the . . . unfair labor practice." *Allied Mech. Servs., Inc.*, 357 NLRB No. 101, 2011 WL 5374170, at *30. Several parties filed exceptions to that decision, and the full Board reviewed the case.

While the case was pending before the Board, the Supreme Court issued its decision in *BE & K Constr. Co. v. NLRB*, 536 U.S. 516 (2002). That decision added to the body of case law concerning the necessary standards for finding employers liable under the NLRA for civil suits filed against labor unions, and the opinion suggested that a more stringent test may be required to avoid implicating First Amendment concerns related to citizens' rights to petition the government for the redress of their grievances.[3] Accordingly, the Board remanded to the ALJ for reconsideration in light of *BE & K*. *See Allied Mech. Servs., Inc.*, 357 NLRB No. 101, 2011 WL 5374170, at *33–40. After the parties filed briefs, the ALJ issued a supplemental decision.

---

[3] The Supreme Court recognized that this right is implicated in these cases. For example, in *BE & K*, the majority made clear that "the genuineness of a grievance does not turn on whether it succeeds" and clarified that "even unsuccessful but reasonably based suits advance some First Amendment rights" such as the "public airing of disputed facts." 536 U.S. at 532 (internal quotation marks omitted).

The ALJ adopted and applied a modified test that, in order to violate the NLRA, litigation must be both (1) objectively baseless (as opposed to simply unsuccessful) and (2) retaliatory. In its supplemental decision, the ALJ again concluded that liability under the NLRA was warranted. As to objective baselessness, the supplemental decision stated, "[n]o 'reasonable litigant' could realistically expect success on the merits of this lawsuit, filed as it was with no facts ascertained, contract claims clearly precluded by the final and binding arbitration, the obvious primary nature of the disputes, and no evidence whatsoever to connect the two international unions with the events complained of." *Allied Mech. Servs., Inc.*, 357 NLRB No. 101, 2011 WL 5374170, at *39. The ALJ found the retaliation prong satisfied on the basis of Allied's history of unfair labor practices against the unions and individual employees, the timing of the lawsuit, "[r]espondent's avowed purpose to 'get even' with the unions," passages in Allied's pleadings maligning the unions' and employees' protected activity, and the lack of a reasonable basis in bringing the suit. *Id.*

Over the dissent of one member, the NLRB adopted the recommended disposition of the ALJ. *Id.* at *1–22. Although *BE & K* stopped short of providing a specific test and focused instead on the type of test that underprotected petitioning rights, the NLRB adopted the ALJ's modified test, which it viewed as satisfying the Supreme Court's First Amendment concerns. The Board's test permits liability only when the challenged legal action was (1) objectively baseless, meaning that no reasonable litigant would have expected to succeed on the merits of the action, and (2) subjectively baseless, in this context meaning that it was intended to retaliate against the union for its protected activity. *See BE & K Constr. Co.*, 351 NLRB 451, 456 (2007). Allied timely sought review in this court.

While the Board defends its legal test and the application of it, Allied argues that the Board's test for finding liability under § 8(a)(1) of the NLRA underprotects First Amendment rights to file suit in federal court. Allied also challenges the Board's determination, pursuant to its interpretation of § 8(a)(1), that Allied's lawsuit was

objectively baseless and retaliatory.  Finally, Allied challenges the Board's award of attorneys' fees and expenses.

This case—invoking as it does First Amendment concerns and facts particularly within the judicial ken—is one of the unusual cases in which the Board's finding of an unfair labor practice lacks substantial evidence.  This court must enforce a Board decision when "the record viewed as a whole provides sufficient evidence for a reasonable factfinder to reach the conclusions the Board has reached." *NLRB v. Galicks, Inc.*, 671 F.3d 602, 607 (6th Cir. 2012) (internal quotation marks omitted).  Our application of that scope is of necessity somewhat less deferential in this case, because each of the primary underpinnings for substantial-evidence deference has little force in this context.  This is neither a case where the agency is in a better position to find facts, nor a situation where the NLRB's expertise in labor relations or its special role as a primary source of national labor policy serves as a basis for deference in fact finding. *See, e.g.*, *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 350 (1978).

Deference to agency fact finding can be justified partly on the agency's having heard witnesses and seen the evidence. *See generally* 2 Richard J. Pierce, Jr., Administrative Law Treatise § 11.2 (5th ed. 2010) (discussing the evolution of substantial-evidence review).  This rationale does not apply to the question of whether the previous lawsuit in this case was reasonable.  We are dealing with, after all, the likelihood of success of a case in federal court, and not with questions of credibility.  Drawing inferences from basic facts can be done just as easily—if not more so—by the reviewing court as it can be by the Board.

Deference to the agency is also justified in labor law and in other administrative law contexts by the agency's expertise and the agency's primary role as a policy maker. *See, e.g.*, *Dickinson v. Zurko*, 527 U.S. 150, 160–61 (1999); *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620–21 (1966); *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 145–46 (1939).  It is for these reasons, presumably, that court deference is to the Board rather than the ALJ when the two come to different factual conclusions. *See*

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951); *UAW v. NLRB*, 514 F.3d 574, 580–81 (6th Cir. 2008); *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995). This level of deference is "firmly established . . . in cases raising issues of fact not within the conventional experience of judges." *Far East Conference v. United States*, 342 U.S. 570, 574 (1952). In contrast, the instant case deeply implicates the First Amendment right to bring suit, and courts, more than agencies, have expertise in determining the scope of that right, although the Board has presumed expertise in how protecting that right will affect labor relations. The court also has more expertise than the Board in determining the objective merit of federal lawsuits.[4]

Related to this "expertise" rationale is the idea that the NLRB is intended to have a primary role in defining labor policy. *See NLRB v. Insurance Agents' Int'l Union*, 361 U.S. 477, 499 (1960); *NLRB v. Hartmann Luggage Co.*, 453 F.2d 178, 183–84 (6th Cir. 1971). "[T]he function of striking [the] balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the [NLRB], subject to limited judicial review." *NLRB v. Local Union No. 103*, 434 U.S. at 350 (internal quotation marks omitted). The Board "acts in a public capacity to give effect to the declared public policy of the [NLRA] to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 193 (1941) (internal quotation marks omitted). This concern with policy often has clear applicability when it comes to the Board's leeway to find facts. Thus, for instance, if the relevant fact is whether an employee was fired for union activity, the fact-related question of how much temporal proximity is required has a policy component: the ease of showing causation may affect how cautious employers will be in taking adverse actions following the union activity. This policy-delegation rationale, however, is also not particularly supportive of deference in the context of this case. Congress has of course largely delegated labor policy to the NLRB,

---

[4]In his concurrence in *BE & K*, Justice Scalia drew attention to the serious separation-of-powers concerns at play in these cases: "[Giving deference to the NLRB] makes resort to the courts a risky venture, dependent upon the findings of a body that does not have the independence prescribed for Article III courts. It would be extraordinary to interpret a statute which is silent on this subject to intrude upon the courts' ability to decide for themselves which postulants for their assistance should be punished." 536 U.S. at 538 (Scalia, J., concurring).

but not necessarily policy regarding First Amendment freedoms. *See NLRB v. Insurance Agents*, 361 U.S. at 499. It is clear that the Board's authority does not extend to new "area[s] of regulation which Congress ha[s] not committed to it." *Id.* That these First Amendment rights are implicated in these types of labor cases is made clear in the Supreme Court's discussion in *BE & K*, which recognized that "whether this class of suits falls outside the scope of the First Amendment's Petition Clause . . . presents a difficult constitutional question . . . ." *See* 536 U.S. at 531–32.

Thus, in determining whether substantial evidence supports the Board's decision in this case, our deference is limited by the realization that the purposes for the deference to a large extent do not apply in this case.

When the record as a whole is viewed with the scrutiny warranted by the foregoing considerations, substantial evidence does not support the Board's conclusion that Allied lacked an objective basis for filing the suit. While Allied may have lost in court, its claims do not sink to the level that no reasonable litigant could have expected to succeed on the merits of the case. *See Allied Mechanical Servs., Inc.*, 357 NLRB No. 101, 2011 WL 5374170, at *12; *BE & K*, 536 U.S. at 532. Although the district court granted the unions' motion to dismiss, and although this court affirmed on de novo review, Allied had reason to believe that it could have succeeded on the merits of the case, at least with respect to the local union entities. And although the organizational structure of the union left Allied without hope of success against the uninvolved international unions, their inclusion in the complaint appears more like thorough lawyering and less like frivolity. Certainly the entire case cannot be made baseless by their erroneous inclusion.

While this court ultimately concluded that the secondary-boycott claims were untenable against organizations that did not engage in commerce with Allied, Allied's effort to extend the reach of § 8(b)(2) to inter-union coercion was not entirely unreasonable. The Supreme Court recognized that an unsuccessful lawsuit may yet have had an objective basis,

> because the genuineness of a grievance does not turn on whether it succeeds. Indeed, this is reflected by our prior cases which have protected petitioning whenever it is genuine, not simply when it triumphs. Nor does the text of the First Amendment speak in terms of successful petitioning—it speaks simply of "the right of the people . . . to petition the Government for a redress of grievances."

*BE & K*, 536 U.S. at 532 (internal citations omitted). There may exist baseless suits in which the plaintiff claims to be seeking an expansion of a legal theory and yet such an expansion is plainly and objectively foreclosed. But this is not such a case.

The function of secondary-boycott protection for employers is twofold: "the preservation of the right of labor organizations to place pressure on employers with whom there is a primary dispute as well as the protection of neutral employers and employees from the labor disputes of others." *Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 223 n.20 (1982). Allied argues that it believed that such pressure, exerted on another union with a relationship with Allied—and a relationship the health of which had a serious effect on Allied's ability to obtain and conduct its business—may have been deemed actionable under the secondary-boycott provisions of the NLRA.

Allied conceived of this liability in several possible ways, at least some of which may have been colorable. For example, Allied claimed that Local 357 conducted an illegal secondary boycott by threatening or coercing Local 7 into "ceas[ing] doing business," 29 U.S.C. § 158(b)(4)(i)(B), with Allied by withholding job-targeting funds. There is logic in this argument, despite the fact that this court ultimately rejected it through a narrow construction of the term "doing business." *See Allied Mech. Servs.*, 2000 WL 924594, at *5. To be sure, in affirming the district court's dismissal of Allied's suit with respect to this claim, this court needed to distance itself from several decisions that lent credence to Allied's theory. *Id.* at *5 n.7 ("We are not persuaded that a contrary result is dictated by the decisions in *Limbach Co. v. Sheet Metal Workers International Ass'n*, 949 F.2d 1241 (3d Cir. 1991) (en banc); *Mine Workers (New Beckley Mining Corp.)*, 138 L.R.R.M. 1334 (1991) *enforced* 977 F.2d 1470 (D.C. Cir. 1992); or *George E. Hoffman & Sons, Inc. v. Teamsters Local 627*, 617 F.2d 1234 (7th Cir. 1980)."). But our narrow construction does not require a conclusion that an

alternate, broad construction was not a possible outcome of the litigation. This chance of success—even if small—makes clear that Allied's secondary-boycott claims, while unsuccessful, were not objectively baseless.[5]

This presence of objective basis is in itself enough to warrant reversal if, as Justice Scalia predicted in his concurrence, "in a future appropriate case, we will construe the [NLRA] . . . to prohibit only lawsuits that are *both* objectively baseless *and* subjectively intended to abuse process." *BE & K*, 536 U.S. at 537 (Scalia, J., concurring). However, we recognize that the majority opinion in *BE & K* leaves open the possibility, however unlikely, that liability may still exist even though the unsuccessful suit has an objective basis, if the suit is retaliatory in the heightened sense that the motive is only to impose the costs of litigation on the opposing party. *BE & K*, 536 U.S. at 536–37. After stating that "there is nothing in the statutory test indicating that § 158(a)(1) must be read to reach all reasonably based but unsuccessful suits filed with a retaliatory purpose," the Court nevertheless explicitly declined to "decide whether the Board may declare unlawful any unsuccessful but reasonably based suits that would not have been filed but for a motive to impose the costs of the litigation process." *Id.* at 538. This possibility is problematic because "it poses a difficult question under the First Amendment: whether an *executive agency* can be given the power to punish a reasonably based suit filed in an Article III court whenever *it* concludes—insulated from *de novo* judicial review . . .—that the complainant had one motive rather than another." *Id.* at 538 (Scalia, J., concurring). However, we need not address this troubling possibility here, because the NLRB made no finding that Allied's suit was retaliatory in this stricter sense, nor is there evidence apparent in the record to support such a finding.

---

[5]The breach-of-contract claim was rejected because of the insufficiency of Allied's allegations that the arbitrator's determination departed from the essence of the CBA and was not supported by the CBA. Allied's argument was more colorable then than it would be today. The law of this Circuit was much freer at that time with respect to the ability to review an arbitrator's interpretation of a contract. For instance, an arbitral decision could be overturned if the award "conflict[ed] with express terms of the collective bargaining agreement." *Cement Divisions, Nat. Gypsum Co. (Huron) v. United Steelworkers of Am., AFL-CIO-CLC, Local 135*, 793 F.2d 759, 766 (6th Cir. 1986). Such comparatively nondeferential review of arbitral awards was explicitly overruled in *Michigan Family Res., Inc. v. Serv. Employees Int'l Union Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007) (en banc), but that occurred after the litigation at issue in this case.

The evidence of retaliation cited by the ALJ does not permit the conclusion that Allied brought the suit in order to impose the costs of litigation on the unions. Rather, it shows the more run-of-the-mill type of animus that the Court was reluctant to penalize in its discussion in *BE & K*. *See Id.* at 533–35.[6] The Board cited Allied's historically "tumultuous relationship with Local 357," noting Allied's prior labor-law violations and the conduct that led to those penalties. *Allied Mechanical Servs.*, *Inc.*, 357 NLRB No. 101, 2011 WL 5374170, at *13. The Board also suggested that Allied's inclusion of the international unions in its complaint was evidence that the suit was driven by the same "hostility" Allied "clearly demonstrated in its relationship with Local 357." *Id.* The Board also concluded that "[i]ndependently, the lawsuit was . . . retaliatory on its face" because "[i]t sought an award of money damages from the unions based on their statutorily protected conduct—acting in concert to induce [Allied] via lawful pressure to reach an agreement with Local 357." *Id* at *14. The Board found further evidence of retaliatory motive in Allied's complaint. The Board noted that Allied mentioned the unions' prior unfair-labor-practices complaints and mini-strikes, and the Board concluded that because of these references the "complaint by its very terms demonstrated that [Allied's] lawsuit was motivated by a desire to retaliate against the protected activity of Local 357 and the employees it represented." *Id.* Finally, the Board cited the evidence of objective baselessness as proof in itself that the suit was subjectively retaliatory in that "the lawsuit's obvious lack of merit is further evidence that [Allied] sought to retaliate against the Unions by imposing on them the costs and burdens of the litigation process." *Id.*

Despite this last conclusory statement, the evidence in the record is not substantial enough to show that Allied's motive was specifically to punish the unions

---

[6]The majority did not entirely foreclose the Board's ability to penalize "unsuccessful suits brought with a retaliatory motive" but held that finding a "retaliatory motive," without more, was not sufficient with respect to a suit that was unsuccessful but nonetheless objectively reasonable. If such suits are sanctionable, there must be a greater showing of animus. The majority noted that the Board's then-applicable definition of retaliation "broadly cover[ed] a substantial amount of genuine petitioning," since an employer's suit challenging union conduct that it reasonably believed to be illegal would nevertheless "interfere with or deter some employees' exercise of NLRA rights." *BE & K*, 536 U.S. at 533. The Court recognized that "[a]s long as a plaintiff's *purpose* is to stop conduct he reasonably believes is illegal, petitioning is genuine both objectively and subjectively." *Id.* at 534.

through litigation costs.  Rather, the record indicates that the retaliatory motive, if any, related to the "ill will [that] is not uncommon in litigation."  *See BE & K*, 536 U.S. at 534.[7]  In *BE & K*, the Court reaffirmed its precedent that "[d]ebate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred."  *Id.* (quoting *Garrison v . Louisiana*, 379 U.S. 64, 73–74 (1964)). The evidence cited by the Board may have proved that there was such ill will between Allied and Local 357 as to rise to the level of "hatred."  But none of the evidence offers support for the proposition that Allied's reasonably based suit was filed without regard for the merits and was instead only intended to cost the unions money.

For the foregoing reasons, we deny the Board's petition for enforcement of its order.

---

[7]Even Justice Souter, who wrote separately to note that he would limit the extent to which *BE & K* is read to encourage a strict test, warned that the Board cannot find "'retaliatory motive' almost exclusively [based] upon the simple fact that the employer filed a reasonably based but unsuccessful lawsuit and the employer did not like the union."  536 U.S. at 539 (Souter, J., concurring).  He and the three Justices who joined him left open the possibility that "the evidence of 'retaliation' or antiunion motive might be stronger or different, showing, for example, an employer, indifferent to outcome, who intends the reasonably based but unsuccessful lawsuit simply to impose litigation costs on the union."  *Id.*

---

## DISSENT

---

MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting. Because my colleagues have reached the decision not to enforce the National Labor Relations Board's order against defendant Allied Mechanical Services by ignoring both the evidence in the record and sound principles of administrative law, I respectfully dissent.

In *BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002), the United States Supreme Court recognized that an employer's First Amendment right to petition the courts might be infringed if lawsuits against unions filed by such employers were deemed to be unfair labor practices simply because those lawsuits proved to be unsuccessful. *Id.* at 536. Indeed, the Court noted that nothing in the text of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169, indicates that statutory restrictions on an employer's interference with employee rights "must be read to reach all *reasonably based but unsuccessful* suits filed with a retaliatory purpose." *Id.* (emphasis added). Notably, however, the Supreme Court did "not decide whether the Board may declare unlawful any unsuccessful but reasonably based suits that would not have been filed but for a motive to impose costs of the litigation process, regardless of the outcome, in retaliation for NLRA protected activity." *Id.* at 536-37.

Because the Court in *BE&K Construction* did not formulate the appropriate framework to be used in such challenges, on remand the Board exercised its discretion to do so on its own. Utilizing its expertise in matters of labor law, the Board held that employer-initiated lawsuits against unions violate the protections afforded by section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), if the employer's lawsuit against an employee union "lacks a reasonable basis and was brought with the requisite kind of retaliatory purpose." *BE&K Const. Co.*, 351 NLRB 451, 458 (2007). In this case, the majority does not disagree with the application of the Board's framework; instead, my colleagues attempt to justify their decision to reverse the Board's holding by reference to Allied Mechanical's First Amendment rights and this court's apparently supernatural

ability to decipher precepts of the applicable substantive law. In doing so, the majority ignores salient facts in the record and dangerously subverts long-standing principles of administrative-law jurisprudence.

## I. The Lawsuit Was Objectively Baseless

In August 1998, Allied Mechanical filed suit against two local unions and the unions' international organizations, in essence challenging the decision by Local 7 of the Sheet Metal Workers International Association to deny job-targeting funds to Allied Mechanical on various jobs in western Michigan. The district court dismissed the complaint in its entirety, and a panel of this court affirmed that conclusion in a *per curiam* opinion. *See Allied Mech. Servs., Inc. v. Local 337, et al.*, 221 F.3d 1333, 2000 WL 924594 (6th Cir. 2000). The majority contends, however, that "[w]hile Allied may have lost in court, its claims [d]o not sink to the level that no reasonable litigant could have expected to succeed on the merits of the case." However, a fair review of the record and a proper application of relevant legal principles establishes just the opposite: that the suit was purely and simply a sham.

## A. Baseless Claims Against the International Union Organizations

Astoundingly, the majority declares that "although the organizational structure of the union left Allied Mechanical without hope of success against the uninvolved international unions, their inclusion in the complaint appears more like thorough lawyering and less like frivolity." But this statement is a radical, internally inconsistent, and legally specious proposition. First, from a purely factual standpoint, Allied Mechanical's inclusion of the international unions as defendants in the complaint is the height of frivolousness and an exemplar of how *not* to draft a complaint if one hopes to avoid sanctions under Rule 11 of the Federal Rules of Civil Procedure. Rule 11(b)(3) explicitly states that by signing a complaint and filing it with a federal court, an attorney certifies that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Here, however, Allied Mechanical is patently unable to

make such assertions truthfully.  For example, Allied Mechanical's claims against the Sheet Metal International were dismissed by the district court because the complaint itself failed to indicate that any acts of Local 7 were undertaken as an agent of the international union.

Even more egregious and blatantly without factual basis were Allied Mechanical's claims against the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry (UA).  Indeed, Daniel Huizinga, Allied Mechanical's co-owner, testified before an administrative law judge that he had absolutely "no personal knowledge" that the UA "authorized or approved any of the specific acts alleged in the Complaint," and that no individual from Local 7 had ever told him "that officials of the UA had requested that they deny job-targeting funds to Allied Mechanical."  Furthermore, Huizinga admitted that he had no memory of ever asking Local 7 officials "whether UA Local 357 was coercing [them] to withhold job-targeting funds."  Despite that stark lack of any evidentiary support, Allied Mechanical did not hesitate to allege that the internationals were liable for the actions of the local unions.

As the majority itself asserts, Allied Mechanical was, both objectively and subjectively, "without hope of success against the uninvolved international unions."  I am at a complete loss to understand how the majority can acknowledge the hopelessness and baselessness of such claims and yet assert, without the slightest recognition of the inherent irony, that such pleading "appears more like thorough lawyering."  "Thorough lawyering" does not now, and has never before, justified the advancement of claims without any factual or legal basis.  Such actions smack not of thoroughness but of sanctionable misrepresentation.

**B.  Baseless Claims Against the Local Unions**

Similarly, despite the majority's claims to the contrary, Allied Mechanical had no hope of success on its equally baseless claims against the local union affiliates. Without question, litigants may seek to extend the reach of statutory and constitutional rights and responsibilities.  As even the majority asserts, however, "There may exist baseless suits in which the plaintiff claims to be seeking an expansion of a legal theory

and yet such an expansion is plainly and objectively foreclosed." Although the majority concludes that "this is not such a case," I view Allied's attempt to haul the local unions into court as nothing other than the most thinly veiled attempt to extract precious time, energy, and funds from the locals.

The very fact that Allied Mechanical sought to use the NLRA's prohibitions on *secondary boycotts* to prosecute the local unions proves the point. As we have recognized consistently, "[d]uring . . . a secondary boycott, a union brings economic pressure to bear on a primary employer to do something the union wants . . . by inducing *a secondary employer doing business with the primary employer* to bring economic pressure on the primary employer." *Shafer Redi-Mix, Inc. v. Chauffeurs, Teamsters & Helpers Local Union #7*, 643 F.3d 473, 477 (6th Cir. 2011) (quoting *F.A. Wilhelm Constr. Co. v. Ky. State Dist. Council of Carpenters*, 293 F.3d 935, 938 (6th Cir. 2002)) (internal quotation marks omitted) (emphasis added). Absolutely nothing in Allied Mechanical's complaint against the local unions alleged, or even intimated, that those organizations brought any economic pressure whatever on a "secondary employer" or neutral party. In fact, Allied Mechanical fails to allege that any threats or restraints were directed toward any entity other than Allied Mechanical itself.

Instead, Allied Mechanical argues "that Local 357 conducted an illegal secondary boycott by threatening or coercing Local 7 into 'ceas[ing] doing business,' 29 U.S.C. § 158(b)(4)(i)(B), with Allied Mechanical by withholding job-targeting funds." However, Local 7 is not a "secondary employer" for purposes of this litigation. Rather, both Local 7 and Local 357 represent individual employees *of the same company* – Allied Mechanical. Allied Mechanical cannot simply redefine a secondary boycott as something it is not in order to twist the unambiguous meaning of a statute and then argue, perversely, that it is seeking a good-faith expansion of existing law. We would deem objectively baseless a claim by an apple farmer that he is entitled to subsidies allotted to growers of oranges because apples and oranges both are fruits. Similarly, Allied Mechanical's claim that the local unions violated the *secondary*-boycott provisions of the NLRA because they allegedly engaged in concerted action against their

*primary* employer is an effort to create a cause of action merely by the misuse of well-defined terms and should likewise be considered baseless.

Allied Mechanical's breach-of-contract cause of action against Local 7 comes no closer to being a legitimate claim. Pursuant to Article X of the collective bargaining agreement between Allied Mechanical and Local 7, all disputes of contract interpretation are subject to a specific grievance framework. Allied Mechanical availed itself of that procedure regarding the Kalamazoo Red Cross job, presenting its argument through various stages until it was rejected unanimously by the National Joint Adjustment Board. Because that rejection was unanimous, the decision was "final and binding" on the parties.

Allied Mechanical nevertheless continues to insist before this panel that the decision reached at the final stage of the grievance procedure was incorrect. The parties to the labor contract bargained, however, not for a court adjudication of their dispute, but for settlement through a contractually defined grievance process that was allowed to run its course. Consequently, we could not now overturn the arbitration decision, even if we were convinced that serious error had been committed, "as long as the [grievance panel] is even arguably construing or applying the contract and acting within the scope of [its] authority." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

As recognized in our June 2000 opinion affirming the district court's dismissal of Allied Mechanical's lawsuit against the various labor organizations:

> [A]n award fails to derive its essence from a CBA [collective bargaining agreement] when it conflicts with express terms of a CBA; imposes additional requirements not expressly provided for in the CBA; is not rationally supported by or derived from the CBA; or is based upon "general considerations of fairness and equity," rather than the exact terms of the CBA.

Allied Mech. Servs., Inc., 221 F.3d 1333, 2000 WL 924594, at *6 (citing *Monroe Auto Equip. Co. v. Int'l Union, United Auto., Aerospace, and Agric. Implement Workers*, 981 F.2d 261, 268 (6th Cir. 1992)). None of those justifications for replacing the

bargained-for adjudication of the contract dispute with a court decision are present in this matter.

Indeed, it is impossible for the arbitrator's ruling regarding Local 7's distribution of job-targeting funds to conflict with the express terms of the parties' contract because that agreement never once mentions the term "job-targeting funds" or even references such a concept. Ironically, to reach the result Allied Mechanical asks of this court, we would be required to create new contractual terms or resort to equitable principles not envisioned by the parties when they bargained for the specific grievance procedure employed here – exactly the type of judicial overreaching that federal arbitration and grievance-procedure precedents forbid. Given that prohibition, it is impossible for Allied Mechanical to set aside the "final and binding" decision of the National Joint Adjustment Board. Because no reasonable litigant thus could have expected to prevail on the breach-of-contract cause of action and obtain the relief requested in the complaint, Allied Mechanical's claims in this regard are also objectively baseless.

## II. Allied Mechanical's Subjectively Retaliatory Lawsuit Against the Union Defendants

Even if Allied Mechanical's lawsuit against the unions is deemed objectively baseless, the Board's finding that the company committed an unfair labor practice by filing the action cannot be upheld unless the administrative record also contains substantial evidence in support of the Board's conclusion that Allied Mechanical possessed a subjectively retaliatory motive in pursuing the course of action it did. As in almost any effort to divine subjective intent, it is difficult, if not impossible, to pinpoint testimony in which an alleged violator of a protective statute directly states a desire to contravene the dictates of the enacted legislation. Indeed, what is more often the case, an administrative or appellate record contains self-serving statements contradicting any implication of bias or retaliatory motive. Such is the situation here as well. During his testimony before the administrative law judge, for example, Daniel Huizinga maintained that prior disagreements with labor unions were irrelevant to the company's litigation decision, even though Allied Mechanical's complaint specifically

referenced the fact that Local 357's predecessor, Local 337, "has filed numerous unfair labor practice charges and engaged in mini-strikes and other activities in an attempt to disrupt and damage the business operations of [Allied Mechanical]."

Given the obvious motive for a party to the litigation to sanitize comments bearing on a crucial component of the litigation, agencies and courts are tasked with the responsibility of scrutinizing the records before them in an attempt to discern, from indirect evidence, the true intentions of sometimes bitter adversaries. In this case, the NLRB and the unions advanced three reasons for concluding that Allied Mechanical did indeed prosecute its court action with a motive to retaliate against the unions for engaging in protected activity. The company counters by separating the Board's three stated bases for finding that Allied Mechanical harbored a retaliatory motive in filing its suit and then argues that each one, by itself, is insufficient to justify a subjective finding of retaliation. I reject such disaggregation and instead would analyze each of the unions' arguments as integral parts of an overarching indictment of Allied Mechanical's motives.

The Board and the unions first asserted that the presence of anti-union animus on the part of Allied Mechanical helps to justify the determination that the company possessed a retaliatory motive in filing its federal-court complaint. The majority gives credence, however, to Allied Mechanical's argument that animosity between labor and management will almost always precede the filing of such a court action; otherwise, the parties would have been able to reconcile their differences without resort to time-consuming, expensive litigation. The mere presence of anti-union animus thus cannot, according to Allied Mechanical, justify a finding of subjective baselessness. Moreover, contends the company, its longstanding collective bargaining agreement with Local 7 negates any implication that Allied Mechanical harbored ill will toward labor unions in general.

Although Allied Mechanical is correct that the mere existence of anti-union animus alone would seldom justify a finding that a company possessed an improper motive in filing a lawsuit against a labor union, additional factors are brought to bear in this dispute. The evidence of the tumultuous relationship between Allied Mechanical

on one hand and the UA and Local 357 on the other lends great support to the Board's conclusion that such animus should be considered an important factor in gauging the company's retaliatory motivation in filing its 1998 lawsuit. It is undisputed that Local 357 (and its predecessor, Local 337), despite being recognized as the representative of Allied Mechanical's pipe fitters, was unable to negotiate a collective bargaining agreement with the company from 1991 through the time of the filing of Allied Mechanical's lawsuit in 1998. Indeed, John Huizinga, Allied Mechanical's vice-president, was quoted as saying that he did not believe the company would *ever* sign such an agreement with Local 357. Moreover, the relationship between Allied Mechanical and the union was so fraught with continued bitterness and animosity that the Board, on numerous occasions, found that the company committed unfair labor practices against the union and the employees that Local 357 represented.

In the absence of an outright admission by a company executive that the lawsuit was filed solely to retaliate against the unions for their protected activities, perhaps the most damning indirect evidence of such an improper motive was the claim by John Huizinga to a Local 357 officer that "[s]omeday, you guys are going to make a mistake over there and I'm going to get even with you." The majority conveniently ignores this indication of retaliatory motive in its discussion, failing even to mention the context in which the comment was made. According to testimony before the administrative law judge, Huizinga had just finished complaining to the union official that the local's activities had "cost the Company a lot of money." Obviously, his avowal to "get even" with the union, expressed immediately thereafter, can have only one logical implication – that Allied Mechanical would take whatever opportunity was available to impose a financial burden on the coffers of the labor organization in return. Such an overt threat of retaliation, in conjunction with other evidence of Allied Mechanical's dislike and mistreatment of Local 357, clearly was properly considered by the Board in ascertaining the true motivation of the company in bringing suit against Local 357, Local 7, and the locals' international unions.

Second, the Board and unions pointed to the fact that Allied Mechanical brought suit against the unions for the exercise of protected activities as further evidence of the company's improper motives. Allied Mechanical argued, however, that even though protected conduct might be targeted in a lawsuit, no retaliatory motive can be presumed because "the employer's motive may still reflect only a subjectively genuine desire to test the legality of the conduct" that the employer believed was unprotected. *See BE&K Constr.*, 536 U.S. at 533. But, in this case, Allied Mechanical did not merely "test the legality of [otherwise protected] conduct." The true motive for the company's suit can be gleaned from the fact that, while ostensibly challenging the legitimacy of Local 7's denial of job-targeting funds, Allied Mechanical's complaint gratuitously mentioned that Local 357 "has filed numerous unfair labor practice charges and engaged in mini-strikes and other activities." Those activities, clearly protected under the provisions of the NLRA and, in fact, the subject of some Board rulings in the union's favor, were in no way germane to the gravamen of Allied Mechanical's federal-court suit. The Board thus found that such references in the company's complaint "demonstrated that [the] lawsuit was motivated by a desire to retaliate against the protected activity of Local 357 and employees it represented" for conduct completely unrelated to the basis of the court action. *Allied Mech. Servs., Inc.*, 357 NLRB No. 101, 2011 WL 5374170, at *14 (2011).

The Board and the unions additionally relied on the objective baselessness of the suit to shed light on Allied Mechanical's subjective intent. The company argued that such a consideration improperly conflates the two prongs of the *BE&K Construction* analysis by permitting the mere fact that the suit was objectively baseless to serve also as evidence for a finding that the company filed the suit with a retaliatory motive. If the objective baselessness of Allied Mechanical's suit were the only indication of the company's retaliatory motive, that argument would have more force. In this instance, however, additional considerations bolster the conclusion that the purpose in filing the suit was less than pure. In conjunction with the other bases already mentioned as support for the Board's conclusion, the baselessness of the suit itself is in fact telling evidence of the motive behind its filing. As the NLRB argues in its appellate brief, "Common sense dictates that because the Company could have no realistic expectation

of prevailing on the merits of its lawsuit, it must have filed the lawsuit for some other reason."  Br. of NLRB at 47.  Stated differently:

> [A] complete lack of any reasonable basis to expect success – as opposed to lack of success despite a reasonable basis – is undeniably relevant to motive.  The fact that a litigant could not reasonably hope for – i.e., should have known he had no realistic chance of – success on the merits of his lawsuit necessarily undermines any argument that he sincerely sought relief through that lawsuit.

Br. of NLRB at 49 (citing *Petrochem Insulation*, 330 NLRB 47, 50 (1999), *enforced*, 240 F.3d 26 (D.C. Cir. 2001)).

Without doubt, substantial evidence in the record supports the administrative determination that three articulated bases combined to provide irrefutable support for the proposition that Allied Mechanical's suit against the unions was motivated by an improper, retaliatory objective.  Not only does the record contain evidence of the company's threats of retaliation and other anti-union animus and evidence of Allied Mechanical's attempt to target protected activity that was not at issue in the dispute, but the utter lack of any reasonable basis to expect success in the suit betrays Allied Mechanical's fraudulent intent.

Nevertheless, the majority somehow concludes that the record contains no evidentiary support "for the proposition that Allied Mechanical's *reasonably based* suit was filed without regard to the merits and was instead only intended to cost the unions money."  (Emphasis added.)  The only way such a conclusion can be reached is by beginning with the wholly untenable position that Allied Mechanical's suit was "reasonably based," which under all the circumstances of this case is a premise supported only by fantasy.  The Board correctly concluded that Allied Mechanical had absolutely no chance for success on the merits of the company's claims.  To argue that Allied Mechanical was merely seeking an extension of existing law by arguing that the local unions violated the NLRA's secondary-boycott provisions completely ignores the plain meaning of the term "secondary boycott."  Furthermore, no evidence was adduced by Allied Mechanical to support its inclusion of the international unions as parties

defendant, and it is inconceivable that the company reasonably could have believed that it could advance its breach-of-contract claims in light of the binding arbitral decision of the National Joint Adjustment Board that clearly interpreted the terms of the relevant contract.

In light of the majority's determination that Allied Mechanical's purpose in filing the suit against the unions was mere "hatred" and not based upon a retaliatory motive, I am constrained to believe that my colleagues would never find sufficient evidence of retaliation in any case, absent a direct statement from a company official that retaliation for exercise of protected rights was the actual basis for the suit. This record is replete with evidence that Allied Mechanical indeed harbored "hatred" for labor organizations. The majority has chosen not to notice, however, that the hatred that was proven spilled over into such vituperation that Allied Mechanical was willing to challenge at every turn the very bases of American labor law and take any action necessary to "get even with" the workers and their representatives merely because of the workers' success on claims against Allied Mechanical that alleged repeated violations of the principles underlying protective labor legislation.

I am convinced beyond all doubt that Allied Mechanical's lawsuit was both objectively baseless and subjectively motivated by an unlawful, retaliatory purpose. I thus would hold that the Board appropriately concluded that Allied Mechanical violated the provisions of 29 U.S.C. § 158(a)(1) by haling the local unions and their international organizations into court.

## III. Deference Owed to Certain Administrative Findings

Brief mention must also be made regarding the majority's effort to undermine the legitimacy of the NLRB and of administrative decision-makers in general by asserting that this court owes no deference whatever to findings of the Board that differ from the result that the majority would rather reach. According to the majority, "This is neither a case where the agency is in a better position to find facts, nor a situation where the NLRB's expertise in labor relations or its special role as a primary source of labor policy serves as a basis for deference in fact finding."

I agree that we as a court have a duty to protect the First Amendment rights of Allied Mechanical (and of Allied Mechanical's employees). Given the decisional framework set up in the wake of the Supreme Court's decision in *BE&K Construction*, we are also required to determine whether the claims advanced by Allied Mechanical were objectively baseless. I cannot subscribe, however, to the majority's contention that the NLRB should be stripped of any meaningful role in this litigation.

As part of our analysis, we should examine whether Allied Mechanical acted with a retaliatory, anti-union animus in bringing suit against the labor organizations in 1998. In a case like this one, the Board is in an unique position to examine the parties' histories and evaluate whether actions undertaken by either party are motivated by "mere hatred" or by retaliation for past successes in vindicating workers' rights. Of course, we are not compelled to accept the decision of the Board in all instances. When, however, substantial evidence in the record supports the conclusion of the administrative agency on an issue that requires examination of the motivation of a party, we should defer to that finding.

The majority opinion in this case seeks to upset the carefully crafted balance of responsibilities that characterizes judicial review of administrative determinations. For that reason, and because the majority unreasonably validates the baseless, blatantly anti-union, retaliatory allegations levied by Allied Mechanical against the local and international unions, I respectfully dissent from the majority's decision and would enforce the well-reasoned order of the Board, while denying Allied Mechanical's petition for review.